UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RAMONA K. BROWN,

    Plaintiff,

v.

                            Case No. 8:13-cv-734-T-33AEP

DEPUY ORTHOPAEDICS, INC.,

    Defendant.
_____/

**ORDER**

Now before this Court is Defendant DePuy Orthopaedics, Inc.'s Motion for Summary Judgment (Doc. # 26), filed on June 25, 2013. Plaintiff Ramona K. Brown filed her response in opposition on July 25, 2013 (Doc. # 29), and DePuy filed a reply to Brown's response on August 15, 2013 (Doc. # 33). After due consideration and for the reasons stated below, the Court grants the Motion.

**I. Background and Procedural History**

On March 19, 2009, Brown underwent a knee-replacement procedure in which a P.F.C. Sigma Knee (RP Knee) was implanted in her right knee. (Stip. Facts Doc. # 28 at ¶¶ 1, 26; Doc. # 2 at ¶ 12). In her Complaint, Brown alleges that "the failure of the said device(s) has/have necessitated numerous visits by [Brown] to her physicians and other medical care providers/facilities for follow-up

care and treatment because of continued problems in her right knee, including, but not limited to, severe pain, swelling, stiffness, limited range of motion, loss of mobility, and tenderness." (Doc. # 2 at ¶ 13). Brown also claims that she "has required care including, but not limited to, medications, therapy, and nerve blocks, . . . to treat the aforesaid problems in her right knee caused by her orthopedic right knee device" and that "additional surgical intervention is imminent given the state and continuing nature of [Brown]'s right knee problems." (Id. at ¶¶ 14-15).

The RP Knee implanted in Brown's right knee is a modular prosthetic knee system consisting of four basic components: (1) a femoral piece that the surgeon fits over the femur; (2) a patella; (3) a tibial piece that the surgeon fits onto the tibia; and (4) a disk-shaped tibial insert made of Ultra High Molecular Weight Polyethylene that the surgeon places into the tibial tray, and which lies at the point where the tibia and femur meet. (Stip. Facts Doc. # 28 at ¶¶ 1, 26). The RP Knee is a Class III medical device regulated by the Food and Drug Administration (FDA). (Id. at ¶ 5).

According to § 515 of the Medical Device Amendments (MDA) to the Federal Food, Drug, and Cosmetic Act (FDCA), prior to marketing a Class III medical device, the product must gain premarket approval from the FDA. (Id. at ¶ 6). On July 11, 1984, after reviewing DePuy's application for premarket approval, the FDA's independent advisory panel recommended approval of the RP Knee. (Id. at ¶¶ 18-19). When originally considered by the FDA, the RP Knee was approved for use in the LCS Total Knee System. (Id. at ¶ 20). In February of 2000, DePuy utilized the PMA process again and submitted a PMA supplement to secure FDA approval of the RP Knee for use in the P.F.C. Sigma Knee System. (Id. at ¶ 21). On March 16, 2000, the FDA approved the PMA supplement. (Id. at ¶ 22). DePuy has since submitted several supplements to the RP Knee PMA in 2000, 2006, and 2009; each of these supplements passed through the same FDA approval process. (Id. at ¶¶ 23-24). Since issuance of the PMA and related supplements, the FDA still regulates the RP Knee by reviewing annual reports regarding the RP Knee. (Id. at ¶ 25).

The FDA inspected a DePuy facility in Warsaw, Indiana on May 10, 2011, through June 7, 2011. (Warning Letter Doc.

# 2 at 18). On December 8, 2011, the FDA issued a warning letter stating, among other things, that:

> Our inspection revealed that some of the PFC Sigma Knee System components . . . are adulterated under section 501(f)(1)(B) of the Act, 21 U.S.C. § 351(f)(1)(B), because your firm does not have approved applications for premarket approval (PMA) in effect pursuant to section 515(a) of the Act, 21 U.S.C. § 360(e)(a). . . . These devices are also misbranded under section 502 [of] the Act, 21 U.S.C. § 352(o), because your firm did not notify the agency of its intent to introduce the devices into commercial distribution . . . .

(Id.).

On April 11, 2013, the parties stipulated to the dismissal of many of the original claims – as well as to the dismissal of one of the Defendants – listed in the Complaint. (Doc. # 13). Two claims remain: Brown alleges state-law claims for (1) strict liability and (2) negligence. (Doc. # 2). Under strict liability, Brown alleges defects in design and warnings. (Id. at ¶¶ 27-30). Under negligence, Brown alleges defects in manufacture, design, and warnings. (Id. at ¶¶ 35-36). Brown states that "the basis for her claims of negligence and strict liability against DePuy[ are] largely based on the failures set forth in the . . . FDA letter and whatever other facts that discovery would reveal." (Doc. # 29 at 5).

4

## II. **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A mere factual dispute is not enough to defeat a properly pled motion for summary judgment; instead, only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

When considering a motion for summary judgment, the Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006). The moving party bears the initial burden of showing the Court, by reference

to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). After a moving party has discharged its burden, "the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

Furthermore, if there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). However, when a non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981), cert. denied, 456 U.S. 1010 (1982).

**III. Analysis**

**A. The MDA and Class III Devices**

The Food, Drug and Cosmetic Act (FDCA) requires FDA approval for the entry of new drugs into the market. 21 U.S.C. § 301 *et seq.*; Riegel v. Medtronic, Inc., 552 U.S. 312, 315 (2008). However, "[u]ntil the statutory enactment of the [Medical Device Amendments of 1976 (MDA), 21 U.S.C. § 360c *et seq.*], the introduction of new medical *devices* was left largely for the states to supervise as they saw fit." Riegel, 552 U.S. at 315 (emphasis added). In 1976, Congress "stepped in with passage of the [MDA], which swept back some state obligations and imposed a regime of detailed federal oversight." Id. With the passage of the MDA, "[t]he regulation of medical devices entering the market is [now] governed by the FDCA," as well. Kaiser v. Depuy Spine, Inc., No. 8:12-cv-2596-T35-AEP, 2013 WL 2006122, at *2 (M.D. Fla. May 14, 2013).

Class III medical devices must be approved by the FDA through the premarket approval process, also referred to as "a PMA." 21 U.S.C. § 360e. "The premarket approval process is a 'rigorous' process in which manufacturers submit detailed information as to the safety and efficacy of their devices, which the FDA then reviews, spending an average of 1,200 hours on each submission." Wolicki-Gables v. Arrow

Int'l, Inc., 641 F. Supp. 2d 1270, 1283 (M.D. Fla. 2009) aff'd, 634 F.3d 1296 (11th Cir. 2011) (citing Medtronic, Inc. v. Lohr, 518 U.S. 470, 477 (1996)). "After the FDA completes its review, premarket approval is only granted if there is a reasonable assurance of the device's safety and effectiveness." Stokes v. I-Flow Corp., No. 6:12-cv-991-ORL-36, 2013 WL 1715427, at *3 (M.D. Fla. Apr. 8, 2013) (internal quotations and citations omitted).

Once a device receives premarket approval, the manufacturer may not change its design, specifications, manufacturing processes, labeling, or any other attribute which would affect the device's safety or efficacy without FDA approval. 21 U.S.C. § 360e(d)(6)(A)(i). "If a manufacturer wishes to make such changes, an application for a supplemental PMA must be submitted, which is evaluated under the same criteria as the initial application." Wolicki-Gables, 641 F. Supp. 2d at 1283 (citing Riegel, 552 U.S. at 319). "Moreover, after premarket approval, manufacturers are subject to reporting requirements such as the obligation to inform the FDA of new clinical investigations or scientific studies, 21 C.F.R. § 814.84(b)(2), and incidents where the device may have caused or contributed to death or serious injury, 21

C.F.R. § 803.50(a)." Stokes, 2013 WL 1715427, at *3 (citing Riegel, 552 U.S. at 319).

### B. Preemption of State Law Claims

In keeping with the goal for federal oversight of the regulation of medical devices, the MDA contains an express preemption provision for state law claims:

> (a) General rule. Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k.

"In Riegel, the Supreme Court established a two-pronged test to determine whether a state law claim is preempted." Kaiser, 2013 WL 2006122, at *3. A court (1) "must determine whether the Federal Government has established requirements applicable to [the device in question]. If so, (2) the court "must then determine whether the [state law] claims are based upon [a state's] requirements with respect to the device that are 'different

9

from, or in addition to' the federal ones, and that relate to safety and effectiveness." Riegel, 552 U.S. at 315.

### 1. **Federally Established Requirements**

"Premarket approval imposes device-specific requirements under the MDA, [and therefore] medical devices approved through the premarket process . . . automatically satisfy the first prong." Kaiser, 2013 WL 2006122, at *3; see also Riegel, 552 U.S. at 322-23 ("Unlike general labeling duties, premarket approval is specific to individual devices. And it is in no sense an exemption from federal safety review—-it *is* federal safety review."); Wolicki-Gables, 634 F.3d at 1301 ("The Court noted in Riegel that, in accordance with its holding in Medtronic, Inc. v. Lohr*,* 518 U.S. 470 (1996), premarket approval . . . imposes requirements under the MDA which are specific to individual devices.") (internal quotations omitted); Stokes, 2013 WL 1715427, at *5 ("Since premarket approval imposes device-specific requirements under the MDA, medical devices approved through the premarket process automatically satisfy the first prong.").

In the instant case, the parties agree that the RP Knee was approved for use in the P.F.C. Sigma Knee System – the device and system implanted into Brown – through the

premarket approval process. (Stip. Facts Doc. # 28 at ¶¶ 19-24, 26). As such, the federal government has established requirements applicable to the device in question.

### 2. Requirements that are Different From, or in Addition to, the Federal Requirements

The MDA's preemption statute at 21 U.S.C. § 360k(a)(1), "'expressly pre-empts only state requirements different from, or in addition to, any requirement applicable . . . to the device under federal law.'" Kaiser, 2013 WL 2006122, at *3 (quoting Wolicki–Gables v. Arrow Int'l., Inc., 634 F.3d 1296, 1300 (11th Cir. 2011)). Two claims remain in the instant action: (1) strict liability and (2) negligence. (Doc. # 2). Under strict liability, Brown alleges defects in design and warnings. (Id. at ¶¶ 27-30). Under negligence, Brown alleges defects in manufacture, design, and warnings. (Id. at ¶¶ 35-36).

To succeed on either state law theory of liability – strict liability or negligence in manufacture, design, and warnings – Brown must prove that RP Knee, which was approved through the premarket approval process and is subject to ongoing reporting requirements, is defective or unreasonably dangerous, whether by design defect, a manufacturing defect, or by a failure to warn. See Cooper

11

v. Old Williamsburg Candle Corp., 653 F. Supp. 2d 1220, 1223-24 (M.D. Fla. 2009) ("To sustain a claim of defective product, whether alleging strict products liability . . . or negligence, a plaintiff must demonstrate that . . . a defect existed in the product . . . ."); Marzullo v. Crosman Corp., 289 F. Supp. 2d 1337, 1342 (M.D. Fla. 2003)("In the context of products liability, the basic elements of a negligence cause of action apply . . . . The plaintiff also must establish that the product was defective or unreasonably dangerous.") (internal citations omitted). Because the state law claims require a determination that the product is defective or unreasonably dangerous, it is also possible that "a fact finder could find liability under [the] Florida . . . laws even if the manufacturer had completely complied with the FDA regulations." Stokes, 2013 WL 1715427, at *6. The preemption provision of the MDA exists to dissuade the possibility of such a conflicting result.

The district court in Wolicki–Gables found that Florida laws "corresponding to strict liability for design defect and failure to warn, as well as for negligent design, manufacture, and assembly, imposed requirements that were 'different from, or in addition to' the federal

requirements established for the premarket approval of the device at issue in that case. Accordingly, the District Court dismissed these claims as preempted by the federal scheme." Stokes, 2013 WL 1715427, at *6 (citing Wolicki–Gables, 641 F. Supp. 2d at 1285–88). Following the same reasoning, this Court finds that the state law claims alleged by Brown are preempted.

### C. Limited Exception for Parallel Claims

Because the MDA expressly preempts only state requirements different from, or in addition to, any requirement applicable to the device under federal law, see Wolicki–Gables, 634 F.3d at 1300, "[a] limited exception to the rule of express preemption may apply for 'parallel claims' in which the state-law requirement matches the federal requirement." Lederman v. Howmedica Osteonics Corp., No. 8:13-cv-506-T-30AEP, 2013 WL 3064588, at *2 (M.D. Fla. June 19, 2013).

Although Brown does not specifically state in her Complaint that she intends to allege parallel claims, Brown's response in opposition to DePuy's Motion indicates that Brown intends to allege her state law claims as parallel to the federal requirements:

13

> DePuy failed to meet the federal requirements as it relates to the PFC Sigma Knee System.
>
> * * *
>
> DePuy's violation of federal law insofar as marketing and placing adulterated product components into commercial distribution without premarket approval, and not properly reporting the many incidents that had occurred gives rise to [Brown's] claims of negligence because her claims are no "different" from the federal requirements in the sense that a failure to meet federal requirements would certainly expose [DePuy] to state claims of negligence and strict liability, thereby precluding DePuy's preemption argument.
>
> * * *
>
> However, to the extent that this Court should be inclined to find that [Brown] has not specifically and precisely alleged which federal regulations were not met by DePuy, in order to give rise to her state claims of negligence and strict liability, [Brown] should properly be permitted to amend her Complaint . . . ."

(Doc. # 29 at 9, 10, 11). See also (Bryant Aff. Doc. # 30 at ¶¶ 8, 10).

In Wolicki-Gables, the Eleventh Circuit cited with approval the Seventh Circuit's rationale in McMullen v. Medtronic, Inc., 421 F.3d 482, 489 (7th Cir. 2005): "In order for a state requirement to be parallel to a federal requirement, and thus not expressly preempted under § 360k(a), the plaintiff must show that the requirements are *genuinely* equivalent." Wolicki-Gables, 634 F.3d at 1300

(internal quotations omitted); see also Lederman, 2013 WL 3064588, at *3 (same).

The court in Wolicki-Gables explained:

> Plaintiffs cannot simply incant the magic words "Appellees violated FDA regulations" in order to avoid preemption. Parallel claims must be specifically stated in the initial pleadings. A plaintiff must allege that the defendant violated a particular federal specification referring to the device at issue. To properly allege parallel claims, the complaint must set forth facts pointing to specific PMA requirements that have been violated.

634 F.3d at 1301 (internal citations and quotations omitted). "The allegations must set forth a specific problem, or failure to comply with any FDA regulation that can be linked to the injury alleged. In other words, a plaintiff must identify a particular specification or specific PMA requirement or FDA regulation that defendant violated regarding the plaintiff's medical device and that caused the plaintiff's injury." Lederman, 2013 WL 3064588, at * 3 (internal citations and quotations omitted).

In Lederman, the court found that the plaintiff had failed "to plead the necessary nexus between the [FDA] warning letters, his device, and his injuries." Id. at *4. In the instant case, Brown has failed to show with the required specificity how the warning letters issued in

December of 2011, regarding inspections in May through June of 2011, relate to her medical device implanted in 2009 and to the injury which she alleges resulted from the device. See id.; Wolicki-Gables, 634 F.3d at 1301-02 ("These allegations do not set forth any specific problem, or failure to comply with any FDA regulation that can be linked to the injury alleged.")(internal quotation omitted); Kaiser, 2013 WL 2006122, at *4 (finding that the plaintiff had not stated a parallel claim because his "allegation . . . does not set forth any specific problem, or failure to comply with any FDA regulation *that can be linked to [the p]laintiff's injury*.") (emphasis added).

Indeed, in his Declaration, Mr. Brian E. Motter, WW Vice President of Quality Compliance for DePuy Synthes Joint Reconstruction, states that the "RP Knee components implanted in Ms. Brown were not the subject of the warning letter issued by the FDA on December 8, 2011. . . . Ms. Brown's RP Knee components were not manufactured in Warsaw, Indiana where FDA conducted its inspection subject of the December 8, 2011 warning letter." (Doc. # 25 at ¶ 7). Brown has failed to plead the necessary nexus between the alleged violations, the warning letter, and her injury, and has

16

therefore failed to demonstrate that a genuine issue of material fact exists.

Furthermore, to the extent that Brown requests leave to amend her Complaint, the Court denies the request. The deadline to amend the pleadings passed on May 15, 2013 (Doc. # 16 at 1), and, as demonstrated below, the Court finds that Brown's proposed amendment (Doc. # 29 at 11-13) would be futile. Moreover, the proposed amendment does little to establish the missing connection between the alleged violations, the warning letter, and Brown's injury. Accordingly, no good cause pursuant to Federal Rule of Civil Procedure 16(b)(4) exists to modify the scheduling order and permit amendment of the pleadings.

### D. Private Right of Action

If Brown's claims were parallel to the federal requirements and not expressly preempted, Brown would still require a right to bring her claims as a private litigant. The FDCA provides that all actions to enforce FDA requirements "shall be by and in the name of the United States." 21 U.S.C. § 337(a). "In Buckman [Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 349 n.4 (2001)], the United States Supreme Court construed § 337(a) as impliedly preempting suits by private litigants 'for noncompliance

with the medical device provisions.'" McClelland v. Medtronic, Inc., No. 6:11-cv-1444-ORL-36, 2013 WL 2109965, at *6 (M.D. Fla. May 16, 2013).

In McClelland, the court discussed the "narrow gap through which a plaintiff's state-law claim must fit if it is to escape express or implied preemption." Id. (quoting In re Medtronic, Inc., Sprint Fidelis Leads Prod. Liab. Litig., 623 F.3d 1200, 1204 (8th Cir. 2010)). "The plaintiff must be suing for conduct that violates the FDCA (or else his claim is expressly preempted by § 360k(a)), but the plaintiff must not be suing because the conduct violates the FDCA (such a claim would be impliedly preempted under Buckman)." Id.

Furthermore, even if Brown stated claims that fit into the "narrow gap" contemplated by McClelland, "Florida law does not allow [a plaintiff] to bring a private cause of action to enforce FDA regulations." Kaiser, 2013 WL 2006122, at *5. "[D]istrict courts in this Circuit have consistently held that private actions . . . that seek to enforce violations of FDA regulations are barred because Florida does not recognize such causes of action." Id. See also Stokes, 2013 WL 1715427, at *4 ("[T]o the extent Plaintiff bases his strict product liability, negligence,

or failure to warn claims on [the d]efendant's alleged violations of the FDCA or FDA's implementing regulations, those claims are dismissed for failure to state a claim [because] the Court cannot hear any claims by private litigants to enforce the regulations of the FDA."); Cook v. MillerCoors, LLC, 872 F. Supp. 2d 1346, 1351 (M.D. Fla. 2012) (finding that plaintiff could not rely on allegations regarding FDA violations because no private right of action exists under the FDCA); Wheeler v. DePuy Spine, Inc., 706 F. Supp. 2d 1264, 1268 (S.D. Fla. 2010) (finding that plaintiff's claims for negligence and products liability failed because plaintiff did not identify a Florida law that provides a remedy based on an alleged violation of FDA regulations); Wolicki-Gables, 641 F. Supp. 2d at 1292 ("The Court recognizes that the FDCA and its regulations prohibit off-label promotion by manufacturers, but, even if such a claim were present in this case, there is no private right of action for violations of the FDCA.").

In short, Brown's "claims are preempted to the extent that they are not based on violations of federal requirements, and the claims fail to the extent that they are based on violations of federal requirements, as Florida

law does not provide such a remedy." Wheeler, 706 F. Supp. 2d at 1270. Accordingly, the Court grants summary judgment.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant DePuy Orthopaedics, Inc.'s Motion for Summary Judgment (Doc. # 26) is **GRANTED.**

(2) The Clerk is directed to enter judgment in favor of DePuy Orthopaedics, Inc. and against Plaintiff Ramona K. Brown and thereafter **CLOSE** this case.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 24th day of October, 2013.

*[signature]*
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record